566 A.2d 111

**Robert BEDFORD, Jr.**

v.

**STATE of Maryland.**

**No. 112, Sept. Term, 1987.**

Court of Appeals of Maryland.

Nov. 29, 1989.

George E. Burns, Jr., Julia D. Bernhardt, Asst. Public Defenders (Alan H. Murrell, Public Defender, all on brief), Baltimore, for appellant.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Jillyn K. Schulze, Asst. Atty. Gen., all on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

COLE, Judge.

A jury sitting in the Circuit Court for Baltimore County (Nickerson, J.) found Robert Bedford guilty of first degree premeditated murder, first degree felony murder, first degree rape, robbery with a deadly weapon, and theft of over $300.00. The circuit court sentenced him to death on the murder charge. This case is an automatic appeal, pursuant

to Md. Code (1957, 1976 Repl.Vol.) Art. 27, § 414(a), to this Court's exclusive appellate jurisdiction, under Md. Code Courts and Judicial Proceedings Article § 12–307(4) (Supp. 1988), in cases where the death penalty has been imposed.

A detailed account of the gruesome facts is unnecessary for our resolution of the issues raised. Here the victim was found murdered and sexually abused in the bedroom of her home. At this time she was separated from her husband and her daughter was away at college. The house had been ransacked, personal items had been removed therefrom, and her car had been stolen. Evidence from passengers of the stolen car led to Bedford's arrest, and a subsequent search of his residence led to the recovery of a stereo record player and other personal items belonging to the victim. When arrested, Bedford was found wearing around his neck a gold chain belonging to the victim. Nevertheless, Bedford maintains that he is not the criminal agent.

Bedford's basic attack concerns the admission of certain evidence during the course of the guilt or innocence phase of this trial.[1] He presents three issues which he argues should be resolved in his favor and thereby entitle him to a new trial: (1) it was reversible error for the court to admit evidence of two instances of alleged attempts to escape as demonstrating a consciousness of guilt; (2) the trial court improperly conducted *voir dire* of the jury in that it denied him the right to communicate with his counsel and portrayed him to the jury as a dangerous man; and (3) the trial court improperly admitted nine color photographs of the victim. For all or any of these reasons, Bedford claims he is entitled to a new trial.

---

**1.** We shall not address another question raised by Bedford: whether the testimony of the victim's daughter at trial was improperly admitted because it went to the impact of the crime upon her. Counsel for the State and Bedford have agreed that the death sentence must be vacated and a new sentencing hearing conducted under Article 27, § 413, since victim impact evidence was admitted over objection. *See Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987).

I

At trial, the State sought to introduce evidence purporting to show that Bedford had attempted to escape on two occasions since his arrest in 1987 for these offenses and that this conduct gave rise to an inference that Bedford was guilty of the charged offenses. Over Bedford's objections, the trial judge admitted evidence that during a February strip search, prison guards discovered a four inch wire hidden on Bedford and that in May, guards found Bedford, who had been taken to court for trial, unescorted and wandering inside the courthouse. The trial court noted that while the State's evidence was circumstantial in nature, nonetheless it was admissible as tending to demonstrate Bedford's consciousness of guilt.

This Court has previously examined the admissibility of evidence of flight after a crime has been committed. In *Sorrell v. State,* 315 Md. 224, 554 A.2d 352 (1989), we concluded that "[e]vidence of flight following a crime has generally been held admissible to show consciousness of guilt in Maryland" *Id.* at 227, 554 A.2d at 353; *see also Hunt v. State,* 312 Md. 494, 508–09, 540 A.2d 1125, 1132 (1988); *Huffington v. State,* 295 Md. 1, 16, 452 A.2d 1211, 1218 (1982), *cert. denied* 478 U.S. 1023, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986); *Tichnell v. State,* ·287 Md. 695, 716–17 n. 11, 415 A.2d 830, 841 n. 11 (1980). "Flight" includes an escape or attempted escape from confinement. C. McCormick, McCormick on Evidence § 271 (3d ed. 1984); *see* 2 J. Wigmore, Evidence § 276 (J. Chadbourn rev. 1979).

Although flight is not conclusive of guilt in and of itself, it is one of the factors to be considered in establishing guilt and consciousness of that guilt. 1 Wharton's Criminal Evidence § 214 (C. Torcia 13th ed. 1972). Any evidence contradicting the inference of guilt derived from flight "does not render the evidence of flight inadmissible, but is merely to be considered by the jury in weighing the effect of such flight." *Sorrell,* 315 Md. at 228, 554 A.2d at

354 (quoting 1 Wharton's Criminal Evidence § 214 at 450). With this background in place, we now examine the incidents in question.

■ On the morning of May 20, 1987, Bedford was transported by two officers from the Detention Center to the Baltimore County Circuit Courthouse where he was to attend his trial. Bedford and eleven other prisoners were handcuffed one to the other forming a human chain and led out of the police wagon. They were then led into the building, through the underground garage, and down a hallway toward the holding cells (called the bull pen area). Normally, at this point, prisoners are uncuffed and placed into the cells. One of the transporting officers testified that for reasons he just did not know, Bedford never made it into his assigned lockup cell. In an agreed statement of facts, however, both parties conceded that the prisoners' cuffs had been unlocked by the officer and each prisoner directed into a cell. Bedford had stepped behind the officer as did other prisoners preparing to enter the cell. Bedford, however, did not enter as presumed but instead walked away from the cellblock.

Not long thereafter, Bedford was spotted by an officer who was transporting prisoners down one of the ground floor hallways. That officer testified that he saw someone duck into an open cell in a twenty to thirty foot long dead-end hallway, which at that time was "completely dark except for the light from the hallway going in." The officer approached Bedford and asked him to identify himself and state his purpose for being in the hallway. Bedford did not identify himself, but stated that he had come in through the exit at the end of the hallway. The officer discounted this reply as false since the exit remained locked, and there was only one way into and out of the area. There was no access to any area open to the public. The officer asked Bedford to accompany him to the main desk where other officers recognized and immediately handcuffed Bed-

ford.[2]

■ Bedford argues that he did not "escape" because he never left the courthouse. Any departure "from the bounds where [the defendant] has been assigned," however, is sufficient to constitute escape under Md. Code (1957, 1976 Repl.Vol.) Art. 27, § 139(a)(1). *Stewart v. State,* 275 Md. 258, 271, 340 A.2d 290, 297 (1975).

Bedford may attempt to convince the jury that his "failure" to leave the courthouse is inconsistent with flight giving rise to an inference of guilt. As stated in *Sorrell,* such testimony would go to counteract the weight given the effect of such flight, but would not prevent its admission. We therefore hold that evidence regarding the May 20th incident was admissible.

■ We turn now to the February incident. On February 25, 1987, following arrest and incarceration on charges of first degree murder, robbery, and rape, Bedford was scheduled to be transported from his cell in the Baltimore County Detention Center to the office of a psychiatrist outside of the prison complex. Consistent with normal procedure for all inmates leaving the Center, deputies requested Bedford to remove his clothing in preparation for a "strip-search" to detect the presence or absence of contraband or any tools which might aid his escape. Bedford verbally resisted, asking to see his lawyer or a police captain. This request was denied and Bedford was searched. Inside his "long-johns" the officers discovered a four-inch piece of metal wire sharpened to a point and wrapped in toilet paper. The officer who conducted the search testified at trial that he personally had seen such instruments used to open handcuff locks. When asked to unlock handcuffs by using the four inch wire, however, he was unable to do so. Nevertheless, the State maintained

---

**2.** Bedford subsequently was charged and convicted of the May attempted escape. The Court of Special Appeals affirmed the conviction in an unreported opinion.

that the wire was properly admitted into evidence as supporting the inference that Bedford planned to escape once enroute to his destination.

We note that the crime of criminal attempt in Maryland is governed by a "substantial step" test, whereby a defendant will be found guilty of attempt only where the evidence demonstrates that he took "substantial step[s] toward the commission of [a] crime whether or not his intention [to commit that crime] be accomplished." *Young v. State*, 303 Md. 298, 311, 493 A.2d 352, 359 (1985). In *Young*, we also pointed out that no "substantial step" will be found unless the conduct is "strongly corroborative" of a criminal intention. *Id.* Here, the State argues that Bedford is guilty of attempted escape since he was caught with a sharpened four-inch piece of wire useful to pick handcuff locks.

Bedford retorts that this evidence only shows mere possession of a wire. Standing alone, this evidence is not enough to be regarded as a "substantial step" toward escape and is certainly not corroborative of an intent to flee. First of all, he argues, there is no indication of what he planned to do with the wire. It could have been used for other purposes which do not support the consciousness of guilt theory, i.e., a defensive or offensive weapon, a tool for intra-prison work activity, or any other purpose unrelated to the charges against him.

But in any event, Bedford maintains that the prejudice generated by the evidence that he was in possession of a wire outweighed any probative value that that evidence might have had. It did not imply that he knew that he was guilty of the crimes charged; rather, Bedford contends that the evidence suggested to the jury that he was violent, ignored prison rules, or was otherwise a "bad man." Thus, Bedford concludes the evidence was inadmissible.

The authorities are uniform that evidence of a consciousness of guilt is generally circumstantial and should be more probative on the issue of ultimate guilt than prejudicial to

the defendant. McCormick, *Evidence* § 271; *see* Fed.R. Evid. 403. If the judge finds that the proposed material is likely to lead a reasonable jury to infer the defendant's guilt without causing him substantial prejudice, then the judge may allow the jury to consider the evidence in reaching a verdict as to the charged offense. If, however, the inference as to ultimate guilt is weak and the circumstantial evidence merely tends to create in the minds of jurors the impression that the defendant is of questionable character and has a propensity for bad acts and probably acted accordingly on the charged occasion, then the evidence should be excluded.

We are not convinced that possession of a wire under the circumstances in this case is a "substantial step" toward making an escape. There are too many other possible reasons why Bedford could have been in possession of that wire. While we doubt that the wire would be a tool for intra-prison work activity, we do accept that its presence could lead the jury to other inferences about Bedford. The jury could consider it as a weapon and view Bedford as being violent, or could see defendant's possession of the wire as a breaking of rules. Consequently, it could view Bedford as a "bad man" for breaking such a rule.

Because the possession of the wire is so equivocal, we hold that its admission into evidence was more prejudicial to Bedford than probative of an intent to escape and should have been excluded. It was reversible error to admit this evidence.

Since the judgment of the circuit court must be reversed, "we deem it to be necessary and desirable for the guidance of the lower court and to avoid the expense and delay of another appeal to this Court" to state our views on the remaining issues. *Midgett v. State*, 216 Md. 26, 38, 139 A.2d 209, 215 (1957); Maryland Rule 8–131(a).

## II

Bedford complained to the trial judge that he was not allowed to sit next to his counsel but was forced to sit

some ten feet away flanked by two deputy sheriffs. Defense counsel attempted to preserve for the record the description of the seating arrangement at the time of trial and noted his objection thereto:

> DEFENSE COUNSEL: Just to make the record clear, we have in this room a table which is capable of seating three to four people on each side, and at least one person at either end; and what I am proposing is that, in lieu of the Court's instruction, to place the prospective juror at one end of the table, and that I would like to place my client next to me at the other end of the table, which is approximately eight to ten feet away from the prospective juror. My reason is that, number one, I feel that my client has a right to participate in any proceedings involving jury selection. This is a critical stage of the proceeding. Additionally, my client is clear across the room and seated between two deputies. It gives a prejudicial appearance of custody. It denies my client effective assistance of counsel by placing him out of the confidential communication range with me; and what this means is that either while we have every juror coming individually, I am going to have to get up, cross the room, go between two deputies, whisper in his ear if there is anything he wants me to do with regard to his own defense; I would take exception to any ruling that denies me access in a confidential manner to my client during any of these proceedings.

The trial judge then attempted to clarify the record and rectify the situation:

> THE COURT: Perhaps the record should show, clear across the room is maybe ten or twelve feet, at the moment. Let me ask the deputy sheriff—there is a chair here next to this pillar, which would bring Mr. Bedford within perhaps six feet or so of Mr. McCampbell. Is there any problem, gentlemen, if Mr. Bedford sits there?

Record at Vol. II, pp. 2–3. There being no objection from the sheriff, Bedford was allowed to move.

Bedford argued that even this new arrangement was prejudicial since the distance placed between him and his counsel implied that Bedford potentially was dangerous even to his own attorney. The court responded to counsel's objection:

THE COURT: Your exception is noted. Your motion is denied.

We will place Mr. Bedford closer to you, and afford you, of course, the opportunity at any stage to simply move a few feet over and speak to Mr. Bedford.

*Id.* at 4.

Before analyzing the propriety of this jury selection procedure, we pause to review the nature of the *voir dire* examination itself. *Voir dire,* literally translated means "to say the truth." Webster's Third New International Dictionary, 2562 (1st ed. 1981). Maryland Declaration of Rights Article XXI guarantees a defendant the right to examine prospective jurors to determine whether any cause exists for a juror's disqualification. *Grogg v. State,* 231 Md. 530, 532, 191 A.2d 435, 436 (1962). Pursuant to Maryland Rule 4–231 and the common law, the defendant has the right to be present during *voir dire. Noble v. State,* 293 Md. 549, 446 A.2d 844 (1982); *Williams v. State,* 292 Md. 201, 438 A.2d 1301 (1981); *Hughes v. State,* 288 Md. 216, 421 A.2d 69 (1980); *Bunch v. State,* 281 Md. 680, 381 A.2d 1142 (1978); *Midgett v. State,* 216 Md. 26, 139 A.2d 209 (1958); *LaGuardia v. State,* 190 Md. 450, 58 A.2d 913 (1948). The *voir dire* procedure has as its sole focus the disqualification issue, and is not permitted for any other reasons. *Adams v. State,* 200 Md. 133, 140, 88 A.2d 556, 559 (1952).

In Maryland, no statute or rule exists specifically regulating how *voir dire* is to be conducted, and this Court has determined that the nature and extent of the procedure lies solely within the sound discretion of the trial judge. *Langley v. State,* 281 Md. 337, 341, 378 A.2d 1338, 1340 (1977) (quoting *McGee v. State,* 219 Md. 53, 58–59, 146 A.2d 194, 196 (1959)). Certain guidelines for the scope of *voir dire,*

however, have developed through the years. In *Corens v. State*, 185 Md. 561, 45 A.2d 340 (1946), we reiterated the broad rule that:

> any circumstances which may reasonably be regarded as rendering a person unfit for jury service may be made the subject of questions and a challenge for cause. In other words, an examination of a prospective juror on his *voir dire* is proper as long as it is conducted strictly within the right to discover the state of mind of the juror in respect to the matter in hand or any collateral matter reasonably liable to unduly influence him.

*Id.* at 564, 45 A.2d at 343 (emphasis added).

Further, we also have recognized that:

> ... if there is any likelihood that some prejudice is in the juror's mind which will even subconsciously affect his decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice. This is particularly true with reference to the defendant in a criminal case. Otherwise, the right of trial by an impartial jury guaranteed to him ... might well be impaired....

*Brown v. State*, 220 Md. 29, 35, 150 A.2d 895, 897–98 (1958) (quoting *State v. Higgs*, 143 Conn. 138, 120 A.2d 152 (1956)).

Statutes delineating the order of events during *voir dire* vary. Some provide that the juror is to be sworn prior to being examined. Other statutes require that the juror shall be examined as is any other witness on a factual issue. 47 Am.Jur.2d *Jury*, § 196 (1969 and Supp.1989). A common practice is to have each prospective juror led into the examination room individually. However, where it is shown that no prejudice will result, questions during *voir dire* may be propounded to Maryland jurors collectively, rather than separately. *Evans v. State*, 304 Md. 487, 499 A.2d 1261 (1985) *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 722 (1986). In fact, collective juror questioning long has been standard practice in Baltimore City. *Connor v. State*, 225 Md. 543, 549, 171 A.2d 699, 702 (1961).

Under the Maryland Rules relative to civil and criminal actions, the trial court itself may conduct the examination or may allow the parties to examine the jurors. If *voir dire* is conducted by the court, parties will be allowed to supplement the examination by further proposed questions. Md. Rules 2–512(d) and 4–312(d) as amended in 1984; *See Hunt v. State*, 12 Md.App. 286, 278 A.2d 637 (1971).

The law on the rights of the accused during the challenging phase of the trial is steeped in tradition. At the very least, the defendant must be allowed to be present at trial. This right includes the *voir dire. United States v. Washington*, 705 F.2d 489, 497 (D.C.Cir.1983). The Supreme Court long ago determined in *Hopt v. Utah*, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884) that:

> [t]he prisoner is entitled to an impartial jury composed of persons not disqualified by statute, and his life or liberty may depend upon the aid which, by his personal presence, he may give to counsel and to the court and triers, in the selection of jurors.

*Id.* at 578, 4 S.Ct. at 204, 28 L.Ed. at 265.

The right to be present during the challenging phase includes the "substantial right[ ] of the prisoner to be brought *face to face* with the jurors at the time when the challenges [are] made." *Lewis v. United States*, 146 U.S. 370, 376, 13 S.Ct. 136, 138, 36 L.Ed. 1011, 1014 (1892) (emphasis added); *accord Pointer v. United States*, 151 U.S. 396, 406, 14 S.Ct. 410, 413–414, 38 L.Ed. 208, 213 (1894). In *Lewis*, the Supreme Court based the existence of this right on the fact that the defendant is in a unique position to determine who should sit on the jury to determine his fate.

> As every one must be sensible, what sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another; and how necessary it is that a prisoner (when put to defend his life) should have a good opinion of his jury, the want of which might totally disconcert him; the law wills not that he should be tried by any one man against whom he has

conceived a prejudice even without being able to assign a reason for such his dislike.

*Lewis,* 146 U.S. at 376, 13 S.Ct. at 138, 36 L.Ed. at 1014.

Other courts similarly have found that a defendant has the constitutional right not only to be present during *voir dire,* but also to have adequate opportunity to gain a good perception of the potential jurors. Thus, it is the defendant who should be given the opportunity to read the faces of his jurors. The United States Court of Appeals for the Fifth Circuit in *Bailey v. United States,* 53 F.2d 982 (5th Cir.1931), recognized:

> The answers of prospective jurors as to such matters, which might have the effect of unduly influencing them, and their *manner and demeanor* while under examination, would do no more than furnish such evidence ... [enabling the defendant and counsel] to exercise intelligently the right of challenge, either for cause or peremptory.

*Id.* at 984 (emphasis added).

■ Thus, the defendant must be afforded every opportunity to "size up" his jury and to fully examine each juror so as to assist counsel in determining which jurors should be disqualified for cause or even for no cause at all. *See Langley,* 281 Md. at 343–44, 378 A.2d at 1340. The United States Court of Appeals for the Second Circuit in *United States v. Crutcher,* 405 F.2d 239 (2d Cir.), *cert. denied,* 394 U.S. 908, 89 S.Ct. 1018, 22 L.Ed.2d 219 (1968), stated:

> [T]here is no way to assess the extent of the prejudice, if any, a defendant might suffer by not being able to advise his attorney during the impanelling of the jury.... [W]e can only speculate as to what suggestions [the defendant] might or might not have made, since it would be his prerogative to challenge a juror simply on the basis of the "sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another."

*Id.* at 244 (quoting *Lewis v. United States,* 146 U.S. at 376, 13 S.Ct. at 138, 36 L.Ed. at 1014).

▪ In *Bunch,* we held that "a defendant has the right to be personally present during a bench conference concerning the possible disqualification of the juror for bias." 281 Md. at 688, 381 A.2d at 1146. Being "personally present" implies more than just being in the courtroom. It also means that defendants should be provided "an opportunity to exercise those privileges which their right to be present affords them." *Id.,* 381 A.2d at 1146 (quoting *People v. Medcoff,* 344 Mich. 108, 117, 73 N.W.2d 537, 543 (1955)).

Examining then Rule 724 and its predecessor Rule 775 (now Maryland Rule 4–231), the *Bunch* court concluded that the rule embodied the Supreme Court holding in *Hopt* that "the defendant, being entitled to an impartial jury, may give aid to his counsel and the court in the selection of who should be on the jury." 281 Md. at 687, 381 A.2d at 1145.

A later analysis of the *Bunch* decision in *Wildermuth v. State,* 310 Md. 496, 530 A.2d 275 (1987), emphasized that the rationale for our decision in *Bunch* was that the defendant had been denied a meaningful opportunity to participate in the jury selection process at the bench. *Id.* at 529, 530 A.2d at 291.

▪ The ability to effectively participate is impaired when the defendant is so far removed that he cannot read the faces of the potential jurors. The judge here infringed on Bedford's right to be actively involved in the jury selection process and his right to assist counsel effectively. What is not clear is whether this infringement is sufficient to overturn the conviction. There is no evidence in the record that the jury needed to be shielded from Bedford, and there is no justification in the record for the judge's ruling.

Bedford argues that since he was not seated next to or even at the same table as his attorney, his ability to communicate confidentially with counsel was materially impaired. A defendant has the right to scrutinize the mem-

bers to be considered for his jury, especially when they can determine if he lives or dies. *Lewis*, 146 U.S. at 376, 13 S.Ct. at 138, 36 L.Ed. at 1014. If for any reason the defendant disapproves of the selection of a particular juror, he should be able to communicate this fact to his counsel without the likelihood of stimulating any negative reaction. Here, however, that free-flowing communication between attorney and client was obstructed.

Concededly, communication with counsel was not completely shut off, but it was unquestionably hampered and undermined. While a trial judge has broad discretion in conducting *voir dire*, absent an articulated and legally sufficient reason, a judge should not deprive the defendant of the right to sit beside his counsel and freely communicate confidentially with him nor should the defendant's right to scrutinize potential jurors be denied.

Clearly, the manner in which the *voir dire* was conducted in this case leaves a lot to be desired. In view of the fact that we shall reverse on the first issue, however, we do not have to decide whether the *voir dire* constituted reversible error.

### III

The remaining issue arose when the trial court admitted into evidence nine color photographs of the victim's body. Counsel objected to both the number of photographs and to the fact that they were in color. Four of the pictures showed the scene of the crime and the full body of the victim from four different angles. Photo number five showed the injuries to the victim's hand and the marks on her arms caused by being bound with bedroom curtains. The four remaining pictures were close-up photographs of the victim's head, showing her head injuries from four different angles. The trial judge examined the photos in light of the State's purposes for offering them, and determined that the pictures were not duplicative, nor improperly prejudicial to Bedford.

██   The admissibility of photographs under this state's law is determined by a balancing of the probative value against the potential for improper prejudice to the defendant. *Mills v. State*, 310 Md. 33, 43, 527 A.2d 3, 7 (1987), vacated on other grounds, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). This balancing is committed to the trial judge's sound discretion. *Johnson v. State*, 303 Md. 487, 495 A.2d 1 (1985). In *Johnson,* we reiterated that:

> We have consistently held that whether or not a photograph is of practical value in a case and admissible at trial is a matter best left to the sound discretion of the trial judge.... A court's determination in this area will not be disturbed unless plainly arbitrary.... Under this standard, we have permitted the reception into evidence of photographs depicting the condition of the victim and the location of injuries of the victim's body at the murder site, ...; and the wounds of the victim.

*Id.* at 502, 495 A.2d at 8 (citations omitted). Johnson argued, as does Bedford here, that certain photographs were cumulative proof of previously adduced evidence. In deferring to the trial judge's determination as to admissibility and probativeness, we responded that "all photographic evidence is in some sense cumulative. The very purpose of photographic evidence is to clarify and communicate facts to the tribunal more accurately than by mere words." *Id.* at 503–04, 495 A.2d at 9.

In *Smith v. State*, 182 Md. 176, 32 A.2d 863 (1943) we stated that photographs also must be "shown by competent extrinsic evidence to be true representations of the scene or object which they purport to represent at the time when the appearance of such scene or object is relevant to the inquiry in connection with which the photographs are offered...." *Id.* at 187–88, 32 A.2d at 868. The trial judge's decision usually will not be questioned unless the admission was "likely to so distort the jury's deliberations that its admission was 'plainly arbitrary.'" *Mills v. State*, 310 Md. at 44, 527 A.2d at 8.

Bedford argues that the admitted photographs were irrelevant to the only issue contested, that of criminal agency. He points out that the pictures did not corroborate or discredit any element of the defendant's or the State's case, and merely established *what* happened, not *who* committed the crime. Citing several Pennsylvania and Maine opinions, Bedford alleges that where a photograph has only minimal significance, and no essential evidentiary value, the trial judge should be more inclined to exclude it if it is inflammatory. Nonetheless, we have not adopted such a test and require only that the trial judge not abuse his discretion. Using this accepted standard of review, we cannot find that the trial judge here failed to engage in a reasoned balancing process or that the disputed photographs were likely to distort the jury's deliberations. Accordingly, we find that the photographs were properly admitted.

## IV

Because we do not regard the possession of the wire as a substantial step toward an escape and because Bedford's possession of the wire is subject to interpretations both consistent and inconsistent with his innocence, we think it equivocal and highly prejudicial. It should not have been admitted as evidence. Bedford is, therefore, entitled to a new trial.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED AND CASE REMANDED TO THAT COURT FOR A NEW TRIAL. BALTIMORE COUNTY TO PAY THE COSTS.