971 A.2d 268

**Charles Henry DECKER**

v.

**STATE of Maryland.**

**No. 44, Sept. Term, 2008.**

Court of Appeals of Maryland.

May 13, 2009.

632

Kellie M. Black, Assistant Public Defender (Nancy S. Forster, Public Defender, and Mark Colvin, Assistant Public Defender, of Baltimore), on brief, for petitioner/cross-respondent.

Brian S. Kleinbord, Assistant Attorney General (Douglas F. Gansler, Attorney General of Maryland, of Baltimore, on brief), for respondent/cross-petitioner.

Argued before: BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, and JOHN C. ELDRIDGE, (Retired, specially assigned), JJ.

BARBERA, J.

During the trial of Petitioner Charles Henry Decker, the court admitted evidence that on a previously scheduled trial date Petitioner left the courthouse before trial commenced. The State offered the evidence to show that Petitioner fled from prosecution, thereby reflecting his consciousness of guilt of the charged crimes. Petitioner challenges the admission of

the evidence, arguing that it was too ambiguous and equivocal to be indicative of consciousness of guilt, and, even if marginally probative, its relevance was outweighed by unfair prejudice to him. For the reasons that follow, we hold that the trial court neither erred nor abused its discretion in admitting the challenged evidence.

## I.

Petitioner was tried before a jury in the Circuit Court for Harford County, on June 8 and 9, 2006. The jury found Petitioner guilty of possession of a regulated firearm after having been convicted of a disqualifying crime, driving under the influence of alcohol, and other driving and weapon offenses.

The convictions stemmed from Petitioner's involvement in a single-vehicle accident that occurred in the early morning of January 9, 2005. Petitioner, while driving a Ford Expedition ("Expedition"), evidently lost control of it and drove off the road. Only Petitioner was injured. During their investigation of the accident, police officers found a nine millimeter Beretta handgun on the passenger's seat of the vehicle.

Petitioner conceded during opening statement that he was drunk at the time of the accident, and he stipulated that he had been convicted of a crime that made it illegal for him to possess a firearm. The trial therefore focused on whether Petitioner knowingly possessed the handgun that the police found in the Expedition.

The evidence showed that on the evening before the crash Petitioner and his half brother, William Pell, went "bar hopping." Petitioner drove the Expedition and, over the course of several hours, the two men visited four bars and each drank at least twenty beers and an unspecified number of "shots."[1] At approximately 1:30 a.m., Petitioner and Mr. Pell left the last bar to go home. The two men exchanged words about Peti-

---

1. A "shot" is defined as "a small quantity, esp. an ounce, of undiluted liquor." Random House Dictionary 1771 (2d ed.1987).

tioner's sobriety and ability to drive.  Mr. Pell became angry with Petitioner and decided to make his own way home. Petitioner drove off, alone, in the Expedition.

Petitioner was driving southbound on Conowingo Road, near Main Street, Darlington, when he evidently lost control of the Expedition. It crossed the center line, went off the highway and up an embankment, hit some trees, then rolled down the embankment and back onto the highway.

Deputy Sheriff Ronald Randow was the first officer to arrive at the accident scene.  He found the Expedition unoccupied.  He heard, however, someone walking through the brush of the wooded area of the embankment.  As Deputy Randow began his search of the Expedition, he spotted a man, later identified as Petitioner, standing in the parking lot in front of a convenience store, across the highway.  Deputy Randow radioed Corporal Donald Givident, who was en route to the accident scene, and directed him to go to the parking lot to investigate.  Deputy Randow joined Corporal Givident soon thereafter.  The two officers noticed that Petitioner was bleeding from the mouth, his eyes were glassy, and he smelled of alcohol.  Petitioner told Corporal Givident that he left the scene of the accident because he was scared, had been drinking, and was "fucked up."

Meanwhile, Corporal Mark Fox conducted a more thorough search of the Expedition and found what turned out to be a loaded, nine millimeter Beretta handgun laying on the passenger seat of the Expedition, next to the center console.  Although there were papers strewn around the vehicle, none was atop the handgun.

Petitioner was transported by ambulance to the emergency room of the local hospital.  There, Deputy Randow advised Petitioner that he was under arrest and informed him of the charges, including, evidently, a weapons charge.  Petitioner responded that "the gun in the vehicle was not his."

Deputy Randow testified that he and other officers had Petitioner under guard at the hospital.  At one point, Petitioner was taken to a room for an x-ray.  Deputy Randow and two

other officers waited for Petitioner outside the room. After a few minutes, Deputy Randow had cause to go into the room and saw that Petitioner had left the room via another exit. The police officers later found Petitioner "going down another hallway."

Near the close of Deputy Randow's direct examination, the prosecutor asked him if he had been in the courthouse a year earlier, on June 1, 2005. Petitioner's trial in this case was originally scheduled to go forward on that date. Deputy Randow testified that he was present in the courtroom on that date and observed Petitioner there. Before the deputy could testify further, defense counsel objected. At the bench, the State argued that the evidence it was about to elicit from the deputy was relevant as "flight to avoid prosecution." Defense counsel responded that, unlike the evidence that Petitioner was "trying to leave the hospital," his "being here on a prior court appearance and leaving, I don't know that that is indicia of guilt." The court overruled the objection, reasoning that the evidence was relevant as "indicia of guilt."

Deputy Randow then testified about what took place at the courthouse on the previously scheduled trial date. Deputy Randow spotted Petitioner in the courtroom where the trial was to be held, after which Petitioner "basically [ ] walked out of the courthouse." Officer Randow and other deputies searched the hallways of the courthouse, but could not find Petitioner. Deputy Randow added that Petitioner's trial was postponed for a year.

The defense called one witness, Petitioner's mother, Wanda Decker. Ms. Decker testified that, although the Expedition belonged to her, Petitioner was the primary driver. She also testified that other persons regularly drove the Expedition; she found things in the Expedition "all the time" that did not belong to Petitioner; and on only one occasion did someone retrieve an item that had been left in the Expedition. Ms. Decker also testified that her employer owned a gun and sometimes used the Expedition to take deposits from the store

where she worked to the bank. She was not sure, however, if her employer ever took the gun out of the store.

Without objection from the defense, the court gave the jury an instruction concerning flight evidence, reading verbatim the pattern instruction on that subject from *Maryland Criminal Pattern Jury Instructions*, 3:24. During closing argument, the State summarized three instances of what it characterized as flight by Petitioner: when he walked away from the crash scene; when he left the x-ray room at the hospital through an unguarded exit; and when he left the courthouse on the scheduled first trial date.

The jury found Petitioner guilty of possession of a firearm by a convicted felon, driving while under the influence of alcohol, failure to drive to the right of the center line of a roadway, and transporting a handgun. The court sentenced Petitioner to a total of six years' imprisonment.

Petitioner noted a timely appeal to the Court of Special Appeals, which, in an unreported opinion, affirmed the judgments. The intermediate appellate court held, *inter alia*, that the trial court did not abuse its discretion in admitting Deputy Randow's testimony concerning Petitioner's leaving the courtroom on the prior trial date. That court reasoned that the evidence was relevant as consciousness of guilt, and "[e]vidence of the first two instances of flight, when considered along with the other evidence of guilt, tend[s] to buttress the court's reasoning in admitting evidence of appellant's leaving the courthouse immediately prior to trial one year before."

We granted a writ of certiorari, *Decker v. State*, 405 Md. 290, 950 A.2d 828 (2008), to address two questions. The first, raised by Petitioner, asks:

Did the trial court err in admitting evidence that Petitioner walked out of the courthouse on a prior trial date before the case was called for trial?

The second, raised by the State by way of a conditional cross-petition, asks:

Did the Court of Special Appeals err in failing to address the State's argument that Decker's claim was not properly preserved for appellate review?

## II.

We first address the State's cross-petition. The State argues in its brief: "[T]o the extent that [Petitioner] claims that he was prejudiced as a result of the flight instruction, that claim is not preserved." The State notes that Petitioner "did not object to the flight instruction, and has never alleged that the instruction was not proper in this case. Accordingly, any objection to the flight instruction has been waived." In any event, the State further argues, the instruction was proper. Petitioner replies that he "has not raised any issue concerning the flight instruction." Rather, he challenges only the "admissibility of the testimony that [he] walked out of the courthouse on a prior trial date."

Because Petitioner raises no challenges related to the instruction, we have no need to address the merits of the State's cross-petition.

## III.

Petitioner argues that the trial court erred by allowing the State to elicit evidence that on the previously scheduled trial date he departed the courthouse before commencement of trial. He argues that the testimony was "too ambiguous and equivocal to be admissible as evidence of consciousness of guilt" and was, therefore, irrelevant. Petitioner also argues that, even if arguably relevant, its relevance was outweighed by the risk of unfair prejudice to him. The State counters that the evidence was relevant to establish Petitioner's guilt, and the court exercised proper discretion in admitting it.

"Relevant evidence" is defined in the Maryland Rules of Procedure as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Maryland Rule 5–401. Such

evidence is generally admissible. *Snyder v. State,* 361 Md. 580, 591–92, 762 A.2d 125, 131–32 (2000), *see* Md. Rule 5–402 (providing: "Except as otherwise provided by constitutions, statutes, or these rules, or by decisional law not inconsistent with these rules, all relevant evidence is admissible. Evidence that is not relevant is not admissible."). Relevant evidence may be excluded, however, if it is unfairly prejudicial, confusing to the fact finder, or a waste of time. *E.g., Snyder,* 361 Md. at 591–93, 762 A.2d at 131–32; *see* Md. Rule 5–403 (providing that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

■ It is well established in Maryland that, "[i]f relevant, circumstantial evidence regarding a defendant's conduct may be admissible under Md. Rule 5–403, not as conclusive evidence of guilt, but as a circumstance tending to show a consciousness of guilt." *Thomas v. State,* 372 Md. 342, 351, 812 A.2d 1050, 1055 (2002). Indeed, on a number of occasions we have upheld the admission of such evidence. *See, e.g., Whittlesey v. State,* 340 Md. 30, 62–65, 665 A.2d 223, 239–40 (1995); *Bedford v. State,* 317 Md. 659, 664, 566 A.2d 111, 113–14 (1989); *Sorrell v. State,* 315 Md. 224, 227–28, 554 A.2d 352, 353 (1989); *Hunt v. State,* 312 Md. 494, 508–09, 540 A.2d 1125, 1132 (1988); *Davis v. State,* 237 Md. 97, 105–06, 205 A.2d 254, 259 (1964), *cert. denied,* 382 U.S. 945, 86 S.Ct. 402, 15 L.Ed.2d 354 (1965); *Westcoat v. State,* 231 Md. 364, 368, 190 A.2d 544, 546 (1963).

■ Consciousness of guilt evidence can take various forms, including "flight after a crime, escape from confinement, use of a false name, and destruction or concealment of evidence." *Thomas,* 372 Md. at 351, 812 A.2d at 1055; *accord Sorrell,* 315 Md. at 228, 554 A.2d at 354 (noting that any flight from justice, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, which takes place after the commission of a crime, is admissi-

ble as evidence of consciousness of guilt). The evidence need not be contemporaneous with the crime to be evidence of the defendant's consciousness of guilt. *See, e.g., Sorrell,* 315 Md. at 226–27, 554 A.2d at 352–53 (holding that the defendant's failure to return from a lunch recess during his trial supported a jury instruction on "flight"). Moreover, "[a]ny evidence contradicting the inference of guilt derived from flight 'does not render the evidence of flight inadmissible, but is merely to be considered by the jury in weighing the effect of such flight.' " *Bedford,* 317 Md. at 664, 566 A.2d at 114 (quoting *Sorrell,* 315 Md. at 228, 554 A.2d at 354); *see also Thompson v. State,* 393 Md. 291, 303, 901 A.2d 208, 214–15 (2006) (stating that "a defendant's flight may be motivated by reasons unconnected to the offense at issue in the case and that the determination as to the motivation for flight is properly entrusted to the jury").

■■ Consciousness of guilt evidence is "considered relevant to the question of guilt because the particular behavior provides clues to the person's state of mind[,]" and state of mind evidence is relevant because "the commission of a crime can be expected to leave some mental traces on the criminal." *Thomas,* 372 Md. at 351–52, 812 A.2d at 1055–56 (internal quotation marks and citations omitted). Thus, by application of the accepted test in Maryland for ascertaining relevancy, "guilty behavior should be admissible to prove guilt if we can say that the fact that the accused behaved in a particular way renders more probable the fact of [his or her] guilt." *Id.* at 352, 812 A.2d at 1056 (citation omitted).

■ As with other forms of circumstantial evidence, however, "the probative value of 'guilty behavior' depends upon the degree of confidence with which certain inferences may be drawn." *Id.* "There must be an evidentiary basis, either direct or circumstantial," to link the defendant's conduct to the consciousness of guilt inference. *Id.* at 355, 812 A.2d at 1057.

■ In *Thomas,* we adopted from *United States v. Myers,* 550 F.2d 1036 (5th Cir.1977), a test for determining when

evidence is admissible as consciousness of guilt. Under that test, the probative value of the evidence

"depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt · concerning the crime charged to actual guilt of the crime charged."

*Thomas*, 372 Md. at 352, 812 A.2d at 1056–57 (quoting *Myers*, 550 F.2d at 1049); *see also Snyder*, 361 Md. at 596, 762 A.2d at 134 (recognizing that the consciousness of guilt inference contains four sub-inferences (much like those we later adopted in *Thomas* ), all of which must have evidentiary support).

Notwithstanding the long tradition of admitting consciousness of guilt evidence in Maryland and around the country, we and other courts have recognized that such evidence has the potential to be "unreliable and unfairly prejudicial." *Thomas*, 372 Md. at 353–54, 812 A.2d at 1057 (collecting cases). Consequently, on several occasions, including *Thomas* itself, we have reversed convictions on the ground that evidence admitted to show consciousness of guilt was too ambiguous to be admissible.

In *Thomas*, we held that the trial court committed reversible error by admitting evidence that Thomas, charged with murder, initially resisted the efforts of the police to obtain a blood sample from him pursuant to a search warrant. We concluded that the evidence was inadmissible because the State had not laid an adequate foundation to support the inference that Thomas's refusal to give a blood sample reflected his consciousness of guilt for the murder.[2] *See id.* at

---

2. Thomas was retried following our reversal of his conviction, and the trial court again admitted evidence that he had resisted the blood test. Thomas was convicted, appealed, and again challenged the admissibility of that evidence. The Court of Special Appeals affirmed the conviction, 168 Md.App. 682, 686, 899 A.2d 170, 172 (2006), and we granted a writ of certiorari to review the case. We affirmed, holding that the

357–58, 812 A.2d at 1058–59; *see also Snyder,* 361 Md. at 596, 762 A.2d at 134 (holding that evidence that the defendant had not contacted the police to inquire about the progress of the police investigation into his wife's murder was inadmissible because it was "too ambiguous and equivocal" as evidence of consciousness of guilt); *Bedford,* 317 Md. at 665–68, 566 A.2d at 114 (holding that evidence that the incarcerated capital murder defendant was carrying a four-inch piece of sharpened metal wire on his person was too equivocal as evidence of a plan to escape and unfairly prejudiced the defendant, and as such, was inadmissible).

## IV.

Petitioner acknowledges the four-inference *Thomas* test for determining the probative value of evidence of consciousness of guilt, but he does not specify how his departure from the courthouse on the previously scheduled trial date fails that test. We glean from Petitioner's arguments, however, that he views the evidence as failing the first of the four inferences described in the test ("from the defendant's behavior to flight").[3]

Petitioner devotes much of his brief to a discussion of cases from other jurisdictions in which appellate courts have concluded that a defendant's mere failure to appear for trial, without some indicia that the departure was actual flight from

State provided sufficient evidence on retrial to support the inference that Thomas's refusal to provide a blood sample was connected to consciousness of guilt of the crimes of murder and robbery. *Thomas v. State,* 397 Md. 557, 576–77, 919 A.2d 49, 61 (2007).

**3.** Petitioner's argument is much like the argument the appellant made in *Myers,* the case from which we adopted the test. In *Myers,* the court concluded that an arresting officer's testimony about the defendant's actions at the time of arrest was too inconsistent to be probative of "flight," failing the first of the four inferences identified in the test. *See* 550 F.2d at 1049–50 (pointing out that the officer testified that the defendant, about to be arrested, had stepped three feet away from his motorcycle, then testified that the distance was fifty feet, and, in an earlier court proceeding, testified that the defendant had not stepped away at all).

prosecution, does not support an inference of consciousness of guilt. *See United States v. Sanchez,* 790 F.2d 245, 252 (2d Cir.1986) (holding that it was error for the trial court to "instruct[ ] the jury that it could equate the defendant's non-appearance with 'flight' " and requiring that any evidentiary predicate for a flight instruction must include "*some* evidence surrounding the failure to appear at trial") (internal citations and quotation marks omitted, emphasis in original); *accord State v. Horne,* 376 N.J.Super. 201, 869 A.2d 955, 963 (2005); *Commonwealth v. Muckle,* 59 Mass.App.Ct. 631, 797 N.E.2d 456, 460–62 (2003); *Commonwealth v. Holloman,* 424 Pa.Super. 73, 621 A.2d 1046, 1052 (1993); *Commonwealth v. Babbs,* 346 Pa.Super. 498, 499 A.2d 1111, 1113 (1985); *State v. Burk,* 234 Mont. 119, 761 P.2d 825, 827 (1988); *Commonwealth v. Kane,* 19 Mass.App.Ct. 129, 472 N.E.2d 1343, 1348–49 (1984). Petitioner argues that his unexplained departure from the courthouse on the scheduled trial date is analogous to a mere "failure to appear" for trial and, much like the cases he cites, is too equivocal to have much, if any, probative value as consciousness of guilt.

The State argues, in response to the cases upon which Petitioner relies, that, "[w]hile this case is more than a mere failure to appear, some courts hold that a failure to appear, standing alone, is admissible as evidence of consciousness of guilt." The State cites as one example *United States v. Lacey,* 86 F.3d 956 (10th Cir.), *cert. denied,* 519 U.S. 944, 117 S.Ct. 331, 136 L.Ed.2d 244 (1996). In that case, the defendant failed to appear on the first day of his initial trial and was apprehended a year later. The Court of Appeals for the Tenth Circuit upheld the admission of that evidence, as flight evidence. The court reasoned that, like flight from the crime scene, "evidence of flight that occurs in close temporal proximity to other significant events in the course of a prosecution (such as the commencement of trial) also may be probative of the defendant's guilt." *Id.* at 973; *see also Harold v. State,* 579 So.2d 908, 909 (Fla.Dist.Ct.App.1991) (upholding admission of defendant's failure to appear for a previous trial date in the case); *Scott v. State,* 216 Ga.App. 692, 455 S.E.2d 609, 611

(1995) (holding that the trial court properly admitted as evidence two bench warrants issued for defendant's failure to appear on an earlier date in the same case).

We need not decide the circumstances under which a defendant's failure to appear for trial will support an inference of flight from prosecution. As the State points out, the case at bar is different. Here, unlike in those cases in which the defendant fails to appear for trial, Petitioner had made his way to the courthouse, indeed, to the courtroom where his case was scheduled to be tried and in which one of the State's main witnesses, Deputy Randow, was present. These facts among others, the State argues, make Petitioner's case more like the situation in which a defendant departs while the trial is ongoing. In that regard, the State directs us to our decision in *Sorrell, supra.*

In *Sorrell,* the defendant Sorrell left the courthouse during a recess on the first day of trial, after a State's witness identified him as the person who had assaulted and robbed him. The trial court made a finding that Sorrell had voluntarily absented himself from the proceedings. The court resumed trial in Sorrell's absence and later instructed the jury that it could infer consciousness of guilt from Sorrell's conduct. 315 Md. at 225–27, 554 A.2d at 352–53. Sorrell challenged the court's decision to give the instruction. We held that there were sufficient facts of which the trial court was aware that supported the instruction, including Sorrell's failure to meet his mother for lunch after leaving the courtroom and the officers' inability to locate Sorrell in the courthouse "after a conscientious investigation." *Id.* at 230–31, 554 A.2d at 355.

The State argues that the facts surrounding Sorrell's flight from trial are like those presented in this case. The State directs us to the discussion in *Sorrell* where we said:

Here, a criminal defendant under bond absented himself from trial, did so without explanation either through counsel or by personal notification, was not located after a conscientious investigation, failed to meet his mother for a scheduled

lunch and was identified by an eyewitness shortly before the defendant absented himself from the courtroom.

*Id.*

The State contends that, as in *Sorrell,* the record shows that Petitioner, having appeared for trial, "voluntarily and knowingly absented himself, and could not be located after a conscientious investigation." The State reminds us of Deputy Randow's testimony that he and other officers "checked the hallways," after Petitioner's departure but were unable to locate him. The State also directs us to the docket entries reflecting the following: Petitioner was on bond before trial; the court, on the date of Petitioner's departure from the courthouse, issued a bench warrant for Petitioner's failure to appear at trial; and Petitioner was not apprehended for some six months thereafter.

Petitioner counters that *Sorrell* is distinguishable from his case. He points out that in *Sorrell* it could reasonably be inferred from the facts before the court that the defendant voluntarily absented himself from trial because he was concerned he would be convicted. In the present case, however, the Deputy's testimony provides no indication of why Petitioner left the courthouse. Consequently, Petitioner argues, "[his] departure amounted to nothing more than a mere unexplained absence."

We agree with the State that, in material respect, this case is quite similar to *Sorrell.* In both this case and *Sorrell,* the jury learned that the defendant left the courthouse, whether in the midst of trial, as in *Sorrell,* or on the day trial was scheduled to commence, as here. And both here and in *Sorrell,* the jury could infer from the circumstances surrounding the departure from the courthouse that it likely was prompted by a concern that the trial would not conclude well for the defense. In that regard, the jury in the present case could take into account that Petitioner, well aware of the charges he was facing, departed from the courtroom where his trial was about to occur and where at least one witness for the State (Deputy Randow) was also present.

That Petitioner's departure from the courtroom immediately preceded the originally scheduled trial makes this case also similar to *Bedford, supra.* In that case, we concluded that evidence of a defendant's efforts to avoid imminent trial was indicative of consciousness of guilt. *See Bedford,* 317 Md. at 665–66, 566 A.2d at 114 (upholding the admission of evidence that, on the morning Bedford was brought to the courthouse for trial, he walked away from the holding cell and was spotted by an officer "duck[ing] into an open cell" that was located in a darkened hallway elsewhere in the basement lockup); *see also Smith v. United States,* 777 A.2d 801, 808 (D.C.2001) (upholding the admission of evidence that the defendant attempted to escape from the courtroom after appearing for a preliminary hearing, concluding that, because defendant's attempted flight was from a courtroom immediately after learning of the charges, the evidence "reasonably supported the inference that he fled because of consciousness of guilt" of the charged crimes).

Like these cases, the immediate circumstances of Petitioner's departure from the courthouse support an inference of flight. Further, though our decision would be the same even without additional evidentiary support, the inference of flight from Petitioner's departure from the courthouse was strengthened by other evidence suggesting flight: Petitioner's leaving the scene of the accident because he was scared, had been drinking, and was "fucked up"; and his slipping past his guards at the hospital, later that day.

Petitioner makes much of the fact that his departure from the courthouse was "unexplained." He argues that an inference of flight cannot be drawn from his actions because there is no indication that he acted to avoid trial. We rejected such a notion in *Thomas,* 397 Md. at 578, 919 A.2d at 62. We made clear in that case that, if Thomas had an explanation for the conduct that the State offered as evidence of consciousness of guilt, then "it was incumbent upon him to generate that issue":

Simply because there is a possibility that there exists some innocent, or alternate, explanation for the conduct does not mean that the proffered evidence is *per se* inadmissible. If it was the position of petitioner that he feared needles, or that the drawing of blood violated some religious belief he held, or any other innocent explanation for his conduct, it was incumbent upon him to generate that issue. He had the opportunity at trial to offer alternative theories explaining his resistance to the blood test, and the record is completely devoid of any such evidence.

*Id.; accord Thompson,* 393 Md. at 315, 901 A.2d at 222 (stating that, "[w]here the defendant possesses an innocent explanation that does not risk prejudicing the jury against him, it would be expected that the defendant would present his purported reasons for his flight to the jury"); *see also* 2 J. Wigmore, *Evidence,* § 276, at 129 (J. Chadbourn rev.1979) (commenting that, "[t]he prosecution cannot be expected to negative beforehand all conceivable innocent explanations. The fact of flight is of itself significant; it becomes most significant when after all no explanation is forthcoming."). Petitioner offered no evidence at trial to refute the inference that he fled the courthouse on the previous trial date to avoid prosecution.

We conclude that the State supplied the evidentiary foundation to support the first of the four inferences described in the *Thomas* test, that Petitioner's departure from the courthouse was flight. The remaining three inferences described in the test are supported by the evidence, and Petitioner does not argue otherwise. The court did not err in deciding that the evidence of Petitioner's departure from the courthouse on the previously scheduled trial date was relevant evidence.

Petitioner, citing Md. Rule 5–403, argues that even if the evidence is relevant the prejudicial effect of the evidence outweighed its probative value and the circuit court should have excluded it on that basis. We do not agree.

We have observed that " 'all relevant evidence is generally admissible.' " *Thomas,* 397 Md. at 579, 919 A.2d at 62 (quoting *Merzbacher v. State,* 346 Md. 391, 404–05, 697

A.2d 432, 439 (1997)). Moreover, once a trial court has made a finding of relevance, " 'we are generally loath to reverse [the] trial court unless the evidence is plainly inadmissible under a specific rule or principle of law or there is a clear showing of an abuse of discretion.' " *Id.*

The flight evidence is not "substantially outweighed by the danger of unfair prejudice" to Petitioner such as would render it inadmissible under Md. Rule 5–403, as Petitioner contends. Petitioner's defense was that he did not own the handgun and was unaware of its presence in the Expedition. The flight evidence was an appropriate counter to that defense. *See Thompson,* 393 Md. at 308, 901 A.2d at 218 (stating that flight evidence is "particularly appropriate" when the defendant has placed into issue his or her state of mind at the time the crime was committed).

Nor do we have in this case anything otherwise suggesting that the trial court abused its discretion in ruling that the jury could hear the flight evidence. As we previously noted, the State points out the docket entries reflecting the following: Petitioner forfeited his bond as a result of his conduct on June 1, 2005, a warrant for his failure to appear immediately issued, and it was months before he was apprehended. We presume the court knew those facts when it ruled on the evidence. In this respect, the case stands in sharp contrast to *Thompson,* in which we held that the trial court abused its discretion by giving a flight instruction notwithstanding that the court knew of a reason for the defendant's flight that was unconnected to the case and which, had it been offered by Thompson, could have unfairly prejudiced him in the eyes of the jury. *See id.* at 315, 901 A.2d at 222. In the present case, the court heard no similar reason for excluding the otherwise relevant evidence.

In sum, the challenged evidence was admissible. We affirm the judgments, accordingly.[4]

---

4. Because we have decided that the trial court properly admitted the evidence, we do not need to address the State's argument that the admission of the evidence was harmless.

650

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.

COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.

Chief Judge BELL joins in the judgment only.